IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ANDREA Y. FERGUSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 10-333-SLR |
| | ) |
| MICHAEL ASTRUE, Commissioner, | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

Angela Pinto Ross, Esquire of Doroshow, Pasquale, Krawitz & Bhaya, Wilmington, Delaware. Counsel for Plaintiff.

Charles M. Oberly III, Esquire, United States Attorney, District of Delaware, and Dina White Griffin, Esquire, Special Assistant United States Attorney, District of Delaware, Counsel for Defendant. Of Counsel: Eric P. Kressman, Esquire, Regional Chief Counsel, and Stephen M. Ball, Esquire, Assistant Regional Counsel of the Office of General Counsel, Philadelphia, Pennsylvania.

**MEMORANDUM OPINION**

Dated: June 6, 2011
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Andrea Y. Ferguson ("plaintiff") appeals from a decision of Michael J. Astrue, the Commissioner of Social Security ("defendant"), denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. Plaintiff has filed a motion for summary judgment asking the court to award her DIB benefits or, alternatively, remand the case for further proceedings. (D.I. 8) Defendant has filed a cross-motion for summary judgment, requesting the court to affirm his decision and enter judgment in his favor. (D.I. 11) The court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g).[1]

## II. BACKGROUND

### A. Procedural History

Plaintiff applied for DIB on September 12, 2007 alleging disability since May 4, 2007 due to seizures and headaches that occur as result of a brain tumor that was previously removed. (D.I. 6 at 120) Plaintiff was 41 years old on the onset date of her alleged disability and at the time her application for benefits was filed. (*Id.* at 139) Her initial application was denied on December 6, 2008 and upon her request for

---

[1] Under § 405(g),

[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision . . . . Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides . . . .

42 U.S.C. § 405(g).

reconsideration on February 14, 2008. (Id. at 74, 82) Plaintiff requested a hearing, which took place before an administrative law judge ("ALJ") on October 23 2008. (Id. at 27) After receiving testimony from plaintiff, plaintiff's husband, and a vocational expert ("VE"), the ALJ decided on March 6, 2009 that plaintiff is not disabled within the meaning of the Social Security Act, specifically, that plaintiff can perform other work that exists in the national economy. (Id. at 25) Plaintiff's subsequent request for review by the Appeals Council was denied. (Id. at 2) On January 28, 2008, plaintiff brought the current action for review of the final decision denying plaintiff DIB. (D.I. 2)

## B. Plaintiff's Non-Medical History

Plaintiff is currently 45 years old. She has a high school education and completed three years of college. (D.I. 6 at 148) Her past relevant work consists of acting as a credit card collections representative for Bank of America. (Id. at 144) This work was characterized as "sedentary" by the VE; it involved sitting most of the time, and lifting no more than 10 pounds. (Id. at 64, 144) Plaintiff has not worked since 2007. (Id. at 33)

## C. Medical Evidence

### 1. Physical impairments

Plaintiff was treated at Comanche Memorial Hospital in Lawton, Oklahoma on May 4, 2007 after suffering from a single grand mal seizure that lasted less than five minutes. (D.I. 361) She was alert and oriented, in no acute distress, and had no other injuries other than a tongue bite requiring three stitches. (Id. at 362-364) A CT scan was performed revealing a left frontal convexity meningioma. (Id. at 371) Plaintiff had

2

a history of seizures as a child, but they had since resolved. (*Id.* at 209)

Dr. Kennedy Yalamanchili M.D. ("Yalamanchi") performed a left frontal craniotomy for resection of a left frontal meningioma on plaintiff on May 18, 2007 at Christiana Care Heath Services, Wilmington, Delaware. (*Id.* at 209) The surgery was uncomplicated. (*Id.*) On July 16, 2007, Yalamanchili noted in a follow-up examination that plaintiff was doing well and could return to work as needed. (*Id.* at 234) During the follow-up, plaintiff reported that she continued to have intermittent headaches, but that they were improving, and that she had ongoing tiredness. (*Id.*)

Plaintiff was examined by Lanny Edelsohn, M.D. ("Edelsohn") on August 14, 2007 who noted normal physical and neurological function. (*Id.* at 229-230) Edelsohn noted that there had been no further seizure activity but that plaintiff had accidently hit her head on the satellite dish and developed some headaches which were slowly improving. (*Id.* at 229) She was allowed to return to driving in a month and was told that she could return to work on October 1, 2007. (*Id.* at 230) A brain MRI on September 27, 2007 showed no new intercranial abnormality since plaintiff's post-operative MRI on May 19, 2007. (*Id.* at 233)

Plaintiff received a second follow-up with Yalamanchili and Edelsohn on November 13, 2007. Yalamanchili noted that plaintiff had recovered well. (*Id.* at 232) Plaintiff reported some residual swelling of the left periorbital tissues since her surgery. (*Id.*) She had recently been given a flu shot and, shortly after, noted headaches, sores in her mouth and swelling about the mouth. (*Id.*) All but the headaches and residual swelling appeared unrelated to the surgery, although all symptoms appeared to be

3

improving. (*Id*)

Plaintiff received an occipital nerve block from Dr. Faisal Sayeed, MD ("Sayeed") on July 2, 2008, to treat symptoms of occipital neuralgia, myofascial pain, and tension headaches. (*Id*. at 465) On October 10, 2008, plaintiff reported that the nerve block procedure worked well and afforded her good relief, but that the effect was then wearing off. (*Id*. at 472)

Plaintiff began seeing Dr. John Kehagias, M.D. ("Kehagias") in May 2007, and had monthly appointments for routine medical management from May 2007 to September 2008. (*Id*. at 246-340) On September 27, 2007, Kehagais' progress report indicated normal or negative physical, neurological and mental signs. (*Id*. at 309-17) Plaintiff's mood was calm and she was not depressed or anxious. (*Id*. at 315) Plaintiff reported that she engaged in regular aerobic exercise.[2] (*Id*. at 312) Despite these findings, Kehagias filled out an insurance claim form indicating that plaintiff cannot stand or walk, could not drive, had a less than sedentary functional capacity and had severe psychological impairment. (*Id*. at 214-22) Also in the report, Kehagais noted that plaintiff had three headaches in the last week that lasted a total of four hours. (*Id*. at 310) The headaches caused a change in household functions, sleeping patterns and social interaction. (*Id*.) They were exacerbated by alcohol intake, exertion, eye strain, computer work, fatigue, menstrual cycle, position change, sneezing and Valsalva maneuvers. (*Id*.) Relieving factors included decreased caffeine intake, cold

---

[2] It is unclear from Kehgias' progress note whether plaintiff engaged in aerobic exercise only prior to her craniotomy or after as well. The exercise notation is listed only in the "Social History" section of the notes. (D.I. 6 at 312)

application, heat application, rest, sleep and stress reduction. (Id.)

On September 25, 2008, Kehgias reported normal or negative signs after examining plaintiff. (Id. at 449-50) For the first time, Kehgais noted that plaintiff tested positive for Lyme's disease, but that it did not affect her daily activities. (Id. at 448) Plaintiff complained of severe neck pain that was increasing in severity. (Id.) The effect on daily activities is a change in activity level and a change in sleeping patterns. (Id.) Despite plaintiff's complaint of neck pain, Kehagias reported that plaintiff's neck was supple, non-tender, had no carotid bruit, no jugular venous distention, no lymphadenopathy and no thyromegaly.[3] (Id. at 451)

Plaintiff underwent physical therapy performed by Anna W. Ill, D.P.T. ("Ill") who treated plaintiff once a week from February 2008 though September 2008. (Id. at 381-84) Plaintiff's initial evaluation on February 29, 2008 indicates that she complained of frequent tension headaches with light sensitivity and tenderness to palpation in the left upper and middle trapezius musculature, as well as periodic edema and pain in the cervical and shoulder region with activity. (Id. at 379) Treatment notes indicate complaints of migraine headaches, tenderness of her lower cervical area, decreased cervical range of motion, muscle soreness after activity and easy fatigability with reduced exercise tolerance. (Id. at 381-84)

On September 25, 2008, Ill completed a Physical Residual Functional Capacity Questionnaire. (Id. at 389-92) Ill noted that plaintiff frequently suffered from pain that

---

[3] As of this last examination, plaintiff was on the following prescriptions: tramadol, Cymbalta, Lunesta, Lidoderm, Vicodin, Ciprodex, Cipro, ergocalciferol, doxycycline.

5

was severe enough to interfere with attention and concentration, nonetheless, plaintiff was capable of low stress jobs. (*Id.* at 390) She could stand/walk for less than 2 hours in a given working day, and sit for about 4. (*Id.*) Plaintiff would need to walk every 45 minutes for 5 minutes at a time, and she needed a job where she could shift positions from sitting to standing/walking at will. (*Id.* at 3.)

Also of record are the opinions of state agency medical experts Karen Sarpolis, M.D. ("Sarpolis") and Vinod K. Kantaria, M.D. ("Kantaria"). On December 3, 2007, after reviewing the record (but not personally examining plaintiff), Sarpolis opined that plaintiff's seizure condition was under good control, had a minimal impact on her functioning, and was non-severe. (D.I. 6 at 242) Also after reviewing the record (but not personally examining plaintiff), on February 14, 2008, Kantaria opined that plaintiff had the residual functional capacity to perform light work with frequent postural maneuvers. (*Id.* at 356, 358-59) However, plaintiff could not perform tasks which require balancing, and she could not be exposed to hazards. (*Id.* at 358-59)

### 2. Mental health

On February 7, 2008, Kehagais referred plaintiff to Dr. James Langan, Psy.D ("Langan"). (*Id.* at 372) Langan administered the WAIS IQ and memory tests, and reported that plaintiff is currently functioning within the average range in the area of intelligence. (*Id.* at 374-76) She had "average" abilities in terms of recalling organized, spoken information, but had "low average" abilities when it came to "more complex and demanding learning tasks." (*Id.*) Langan concluded by saying that, while her abilities were functional, they were "slightly below" expectations considering her background.

(*Id.*) Plaintiff also had some difficulties with verbal retrieval, which prevented her from demonstrating the true extent of her learning. (*Id.*)

Langan reported that the results of plaintiff's personality testing were likely invalid due to symptom magnification. (*Id.* at 377) According to Langan:

> Her MMPI-2 profile is likely invalid. The validly configuration is consistent with a person who is attempting to portray herself in an overly favorable light. Typically such individuals do not admit to many common and benign human short comings. Because of this response set, such persons are not usually inclided to admit to psychological symptoms and conflicts. . . . Oftentimes they will admit to physical problems but are relatively closed to the idea that psychological factors may influence or have a role in producing their physical symptoms. Indeed, there is a very high level of endorsement of physical/somatic symptoms in the profile that goes well beyond clinical control samples with orthopedic (e.g., chronic pain) or neurological (e.g. multiple sclerosis) illnesses. A stomatoform disorder cannot be ruled out.

(*Id*)

Langan reported that plaintiff's recovery is somewhat complicated by issues pertaining to depression and emotional function, and that plaintiff has had a history of depression following the death of her daughter in 2000.[4] (*Id.* at 377-78) Langan believed that antidepressants may significantly reduce her level of depression and perhaps improve her overall level of functioning. (*Id.*) Unfortunately, plaintiff is very adverse to considering an antidepressant medication, and stated that she prefers to deal with her depression with the help of family, friends and religion. (*Id.*)

Overall, Langan felt that plaintiff had made a fairly good cognitive recovery from the brain surgery, and that her cognitive abilities are functional in many respects. (*Id.*)

---

[4] Plaintiff and her daughter were involved in a car accident in 2000 when they were struck by a car that had passed from the northbound lane into the southbound lane and hit them head on. (D.I. 6 at 40) Plaintiff's daughter was killed and plaintiff's ankle was crushed. (*Id.*)

She is experiencing some mild difficulties in terms of the speed of her information processing, multitasking and overall accuracy of her performance especially under time pressure. (*Id.*) Plaintiff was overly self critical of her performance even when it was objectively good. (*Id.*)

Langan stated that getting plaintiff out of the house and achieving a greater level of independence by driving might be beneficial for her psychologically. (*Id.*) She was also encouraged to actively participate in daily chores, and she could return to the workforce on a part-time basis. (*Id.*)

On April 7, 2008, plaintiff was evaluated by a Sheppard Pratt psychiatrist. (*Id.* at 394) The only negative notations about plaintiff's mental status was that she presented with a depressed and anxious mood and that she had a constricted affect. (*Id.* at 394) Plaintiff was given a GAF score of 55 which indicates an individual with moderate symptoms or moderate difficulty in social functioning. (*Id.*; D.I. 12 at 7 n.2) Plaintiff was prescribed an antidepressant and sleep aid. (D.I. 6 at 396) On April 28, 2008, at a follow-up, her mood was listed as "euthymic" and no longer depressed. (*Id.* at 397) A second follow-up on August 14, 2008 reiterated the improvement. (*Id.* at 399)

Also of record is the opinion of state agency medical expert Carlene Tucker-Okine, Ph.D ("Okine") who, on February 14, 2008, after reviewing the record, opined that plaintiff's symptoms of depression and anxiety were not severe. (D.I. 6 at 344)

### D. Hearing Before the ALJ

#### 1. Plaintiff's testimony

Plaintiff lives with her husband and son. She is 5'5 3/4" and weighs 138 pounds.

8

(*Id.* at 50) If plaintiff performs any activity that requires exertion, such as lifting less than 10 lbs, her face, neck, arms, hands and legs swell up and give her pain. (*Id.*) She swells up two to three times a week on average. (*Id.* at 52) Plaintiff can stand for three minutes and walk about a block and a half. (*Id.*) She was diagnosed with Lyme's disease which causes her to be tired and winded all of the time. (*Id.* at 53) Plaintiff can sit for about an hour; any longer, and she dozes off. (*Id.* at 55)

Prior to her surgery, plaintiff worked for Bank of America as a collections representative, calling individuals who were delinquent in their mortgage payments in an attempt to put them on a plan to try and get them caught up before their home was sold at a sheriff's sale. (*Id.* at 38) Her work required her to speak with customers, review payment records, bank statements and credit reports. (*Id.*) Many of these tasks were performed on a computer. (*Id.*) Prior to her surgery, plaintiff did not wear glasses and could stare at the computer screen for a significant period of time. Now she wears bifocals and gets severe headaches. (*Id.* at 38-39) Plaintiff's body swells up in the morning and her face "turns black," further preventing her from working. (*Id.* at 43)

Plaintiff testified that immediately after the surgery, her mood was "black" and she was constantly afraid. (*Id.* at 40) Even before the surgery, plaintiff suffered from depression stemming from the loss of her young daughter in a car accident. (*Id.* at 40-41)

Plaintiff is attending physical therapy because of the swelling. (*Id.* at 43-44) In order to manage her pain, plaintiff is taking Mobic, Vicodin, Tylenol Three with codeine, and Tramadol. (*Id.* at 44) Plaintiff experiences side effects including dizziness and

nausea and fatigue. (Id. at 44-45) Her fatigue causes plaintiff to nap frequently, taking as many as three naps per day, each as long as two hours, although now averaging one. (Id. at 45, 55) She has trouble sleeping at night and will sometimes have to take Valium to get to sleep. (Id. at 46) She is usually in bed by 9:00 pm, and awake by 2:00 am, at which point she will sit up and lean her back on the back of the bed or stare at the ceiling. (Id.)

Plaintiff does not participate in the daily chores at her home. (Id. at 45) Instead, her husband prepares the family meals, and her son does the housework such as vacuuming and laundry. (Id.) When her pain hits, no matter the form, she becomes downtrodden and short tempered with those around her. (Id. at 49)

Plaintiff testified that she has migraine headaches every day, and that she sees Dr. Sayed, a pain management specialist, who gives her injections for her migraines. (Id. at 47) Ever since her diagnosis of Lyme's disease, plaintiff has been seeing Dr. Hasne, a joint specialist. (Id.) She also has trouble concentrating, and is easily distracted. (Id. at 49)

### 2. Testimony of plaintiff's witnesses

Plaintiff's husband testified that she does not participate in household chores, and that he had to change his work schedule at Wachovia bank so that he could be home to help take care of their son when he came home from school. (Id. at 59-60) Plaintiff does not cook anymore because she once left the stove on after trying to prepare a meal for their son. (Id. at 59)

Plaintiff's husband also testified that plaintiff suffers from frequent mood swings

10

wherein she goes from a normal state to crying without provocation. (*Id.* at 60) She

also has frequent trouble sleeping, and naps a lot during the day. (*Id.* at 60-62)

Plaintiff frequently complains to her husband about being tired and her body aching.

(*Id.* at 61)

### 3. Vocational expert testimony

The hypothetical question that was asked by the ALJ was as follows:

> I'd like for you to assume a person who is 40 years of age on her alleged
> onset, which she puts at 5/4/07, has a 12th grade education plus two and a
> half to three years of college. Suffering from status post effects of [a] brain
> tumor in '07 in May, she has been diagnosed, at least has a positive for
> Lyme's disease and some depression, all which cause her to have mild to
> moderate fatigue, energy loss, occasional headache, indicates migraine, and
> some moods swings of late, of which is somewhat relieved by her
> medications without significant side effects. But she says she derives some
> dizziness, nausea and some sleepiness from one or a combination. If I find
> that she needs to have simple, routine, unskilled jobs, Ms. Cody, low stress,
> low concentration, low memory, is able to attend tasks and complete
> schedules, probably SVP one or two jobs. She seems to be mildly and
> moderately limited in her ability to perform her ADL's and to interact socially
> and to maintain her concentration, persistence and pace. And if I find that
> she can lift 10 pounds occasionally and lesser amounts frequently, stand for
> 30 minutes, sit for 10 minutes consistently on an alternate basis during an
> eight-hour day, five days a week. Would have to avoid heights and
> hazardous machinery, ropes, scaffolds, stairs but would seem to be able to
> do sedentary work activity, would there be jobs you can give me in significant
> numbers in the national economy that such a person in your opinion as a
> Vocational Expert?

Based on this hypothetical, the VE testified that plaintiff could perform a limited number

of light, unskilled jobs, such as a "final assembler" a "bench hand," or a "table worker."

(*Id.* at 64-65) The VE stated that each of these jobs would allow plaintiff to sit and

stand as per the ALJ's requirements. (*Id.* at 65-66) However, the VE admitted that the

Dictionary of Occupational Titles does not specifically address a sit/stand option, but

that she was indicating that a sit/stand option would be available based upon her work experience placing people with similar disabilities in these jobs. (*Id.* at 66) Plaintiff would not be able to perform her previous vocation with her current limitations. (*Id.*) The VE acknowledged that, if the limitations found in the reports of Kahegus were taken to be true, plaintiff would not be able to perform any of the work to which the VE testified. (*Id.* at 67) Similarly, if plaintiff had to take naps with the frequency and duration that was claimed, she would be precluded from all employment. (*Id.* at 68)

## III. STANDARD OF REVIEW

Findings of fact made by the ALJ, as adopted by the Appeals Council, are conclusive, if they are supported by substantial evidence. Accordingly, judicial review of the ALJ's decision is limited to determining whether "substantial evidence" supports the decision. *See Monsour Med. Ctr. v. Heckler,* 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the ALJ's decision and may not re-weigh the evidence of record. *See id.* In other words, even if the reviewing court would have decided the case differently, the ALJ's decision must be affirmed if it is supported by substantial evidence. *See id.* at 1190-91.

The term "substantial evidence" is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 565 (1988). The Supreme Court also has embraced this standard as the appropriate standard for

12

determining the availability of summary judgment pursuant to Federal Rule of Civil Procedure 56. The inquiry performed is the threshold inquiry of determining whether there is the need for a trial–whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), "which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986) (internal citations omitted). Thus, in the context of judicial review under § 405(g), "[a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence–particularly certain types of evidence (e.g., that offered by treating physicians)–or if it really constitutes not evidence but mere conclusion." See *Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of the plaintiff's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir. 1990).

## IV. DISCUSSION

13

## A. Regulatory Framework

Social Security Administration regulations incorporate a sequential evaluation process for determining whether a claimant is under a disability. 20 C.F.R. § 404.1520. The ALJ first considers whether the claimant is currently engaged in substantial gainful activity. If he is not, then the ALJ considers in the second step whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities. If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the impairment meets the criteria of an impairment listed in the "listing of impairments," 20 C.F.R. pt. 404, subpt. P, app. 1 (1999), which result in a presumption of disability, or whether the claimant retains the capacity to work. If the impairment does not meet the criteria for a listed impairment, then the ALJ assesses in the fourth step whether, despite the severe impairment, the claimant has the residual functional capacity to perform his past work. If the claimant cannot perform his past work, then step five is to determine whether there is other work in the national economy that the claimant can perform. *Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000) (citing 20 C.F.R. § 404.1520). If the ALJ finds that a claimant is disabled or not disabled at any point in the sequence, review does not proceed to the next step. 20 C.F.R. § 404.1520(a). It is within the ALJ's sole discretion to determine whether an individual is disabled or "unable to work" under the statutory definition. 20 C.F.R. § 404.1527(e)(1).

The ALJ is required to evaluate all of the medical findings and other evidence that supports a physician's statement that an individual is disabled. The opinion of a treating or primary physician is generally given controlling weight when evaluating the

14

nature and severity of an individual's impairments. However, no special significance is given to the source of an opinion on other issues which are reserved to the ALJ, such as the ultimate determination of disablement. 20 C.F.R. §§ 404.1527(e)(2) & 404.1527(e)(3). The ALJ has the discretion to weigh any conflicting evidence in the case record and make a determination. 20 C.F.R. §§ 404.1527(c)(2).

## B. The ALJ's Decision

The ALJ considered the medical evidence of record and testimony received at the hearing, and concluded that plaintiff retains the capacity for work and is not disabled as defined by the Social Security Act. The ALJ made the following enumerated findings.

> 1. The claimant met the insured status requirements of the Social Security Act through December 31, 2011.
>
> 2. The claimant has not engaged in substantial gainful activity since May 4, 2007, the alleged onset date (20 C.F.R. § 404.1571 *et seq.*).
>
> 3. The claimant has the following severe impairments: status-post effects of brain tumor, meningioma with craniotomy, Lyme disease, and depression. (20 C.F.R. § 404.1521 *et seq.*).
>
> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1525, 404.1526).
>
> 5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity [(RFC)] to perform sedentary work as defined in 20 CFR 404.1567(a) except lifting ten pounds occasionally and lesser amounts frequently, stand for thirty minutes and sit for ten minutes consistently on an alternating basis during an eight-hour day, five days a week, avoiding heights and hazard[ous] machinery, ropes, ladders, scaffolding, or stairs and limited to simple, routine, unskilled jobs that are low stress, require low concentration and memory, and can attend to tasks and complete schedules, mildly to moderately limited in her ability to perform activities of daily living and to interact socially, and maintain her concentration, persistence and pace.

15

6. The claimant is unable to perform any past relevant work (20 C.F.R. § 404.1565).

7. The claimant was born on September 27, 1966 and was 40 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 C.F.R. § 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 C.F.R. §§ 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20CFR part 404, Subpart P, Appendix).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1560(c) and 404.1569a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from May 4, 2007 through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

## C. Analysis

Plaintiff argues that the ALJ's determination was not based upon substantial evidence because it: (1) improperly rejected plaintiff's testimony; (2) improperly discounted the opinion of Kehagias; (3) failed to indicate what weight he gave to the opinion of Ill; and (4) failed to devise a RFC that incorporated all of plaintiff's impairments. (D.I. 16 at 13) The court considers these arguments within the appropriate context of the regulatory framework.

### 1. ALJ's rejection of plaintiff's testimony

In conjunction with step 3, the ALJ declined to fully credit plaintiff's testimony,

16

concluding that

> the clamant has underlying medically determinable impairments that could reasonably be expected to result in some of the symptoms alleged. The [ALJ] has reservations, however, as to whether the claimant's assertions concerning [her] impairments, and their impact on her condition, can be considered fully credible. The record fails to provide any objective medical evidence that the claimant's impairments are as severe as her hearing testimony indicates. The record fails to show the claimant requiring any hospitalizations, significant active treatment or significant care other than for limited routine medical maintenance, and there have been no significant increases or changes in prescribed medications reflective of an uncontrolled condition, even though the claimant has alleged significant side effects impacting her daily functioning. The record indicates only limited and conservative treatment of her impairments. Her reported lack of activities of daily living is not sustained as a defining condition of her alleged impairments.

(*Id.* at 22)

Plaintiff argues that the ALJ improperly discounted plaintiff's testimony that she could not work, despite the fact that her complaints of fatigue and headaches were reflected at numerous points in the record. (D.I 16 at 16-21) In support of his decision to not give full credit to plaintiff's testimony, the ALJ cited Edelsohn, who opined in November of 2007 that plaintiff could go back to work for 32 hours a week for a month, followed by 40 hours a week for a month, and then full 48 hours per week. (*Id.*) He also cited Ill, who had opined that the plaintiff could perform low stress jobs (*id.* at 23), and the state agency medical consultant who opined that plaintiff could perform light exertional work with hazard precautions. (*Id.*) Finally, the ALJ cited Sarpolis, who concurred that plaintiff's impairment in late 2007 was not severe, that control for her seizures was good, and that she would be able to return to work and resume driving. (*Id.*)

While the ALJ did discount her testimony, "the credibility determinations of an

administrative judge are virtually unreviewable on appeal." *Bieber v. Dep't of the Army*, 287 F.3d 1358 ,1364 (Fed. Cir. 1997); *Wagner v. Department of Agriculture*, 28 F.3d 279, 283 (3d Cir. 1994). Nevertheless, the court finds that the ALJ's decision to discount plaintiff's testimony was supported by substantial evidence. The opinions of the treating physicians alone provided more than enough evidence to call into doubt plaintiff's testimony.

## 2. ALJ's discounting of Kehagias' opinion

As plaintiff's treating physician, Kehagias' opinion is entitled to special significance and, when it is supported by objective medical evidence of record and is consistent with other substantial evidence of record, it is entitled to controlling weight. *See Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(d)(2)). The ALJ cannot disregard the opinion of a treating physician without explaining the reasoning for rejecting the opinion and referencing objective medical evidence conflicting with the opinion. *See Gilliland v. Heckler*, 786 F.2d 178, 184 (3d Cir. 1986). "If, however, the treating physician's opinion conflicts with other medical evidence, then the ALJ is free to give that opinion less than controlling weight or even reject it, so long as the ALJ clearly explains [his] reasons and makes a clear record." *Salles v. Comm'r of Social Sec.*, 229 fed. Appx. 140, 148 (3d Cir. 2007). "An ALJ need not defer to a treating physician's opinion about the ultimate issue of disability because that determination is an administrative finding reserved to the Commissioner." *Id.*

In the case at bar, there is objective medical evidence conflicting with Kehagias' opinion. To begin, plaintiff relies on Kehagias' opinion report of September 2007, an

opinion made less than six months after plaintiff's surgery. (*Id.* at 21) As discussed *supra*, many medical experts who either personally examined plaintiff, or examined the record after September 2007, opined that plaintiff was not significantly disabled and was capable of returning to work in the near future. (Cantaria, Sarpolis, Yalamanchili, Edelsohn; *Id.* at 22-23)

Furthermore, Kehagias' prognosis that plaintiff is completely unable to work is inconsistent with his own reports. For example, Kehagais' progress report dated September 27, 2007 indicated normal or negative physical, neurological and mental signs. (*Id.* at 309-17) Plaintiff's mood was calm, and she was not depressed or anxious. (*Id.* at 315) Plaintiff also noted that she engaged in regular aerobic exercise. (*Id.* at 312) Despite these findings, Kehagais reported that plaintiff was unable to work.

On September 25, 2008, Kehagias reported normal or negative signs after examining plaintiff. (*Id.* at 449-50) Plaintiff complained of severe neck pain that was increasing in severity. (*Id.*) Plaintiff reported that the effect of this pain on daily activities was a change in activity level and a change in sleeping patterns. (*Id.*) Despite plaintiff's complaint of neck pain, Kehagias reported that plaintiffs neck was supple, non-tender, had no carotid bruit, no jugular venous distention, no lymphadenopathy and no thyromegaly. (*Id.* at 451) For the first time, Kehagias noted that plaintiff tested positive for Lyme's disease, but that it did not affect her daily activities. (*Id.* at 448)

These two reports are inconsistent with a determination that plaintiff is unable to work in any capacity and, combined with the reports of other treating physicians, provide a sufficient basis for the ALJ to discount Kehagias' opinion.

19

### 3. **Weight given to Ill's opinion**

In contrast to Kehagias, Ill, a doctor of physical therapy, is considered an "other source[ ]" whose opinion may be considered with respect to the severity of plaintiff's impairment and ability to work, but need not be assigned controlling weight. *See* 20 C.F.R. § 416.913(d)(1). The ALJ noted that in September of 2008, Ill opined that plaintiff could perform low stress jobs, and should be able to tolerate brief periods of low stress activity with slow progression to longer periods, sit 45 minutes at one time, stand 15 minutes, stand or walk less than 2 hours, sit 4 hours, walk around and shift positions and occasionally lift 10 lbs. (*Id.* at 23) The ALJ also noted that Ill's report stated that plaintiff's pain fluctuates significantly and, with the change in medication, it was hard to accurately assess ability for sustained work activity. (*Id.*) Therefore, Ill's opinion is more consistent with the ALJ's non-disability determination than with a disability determination.

Plaintiff's arguments are confusing at best. Plaintiff never discusses the weight (or lack thereof) given to Ill's opinion in her opening brief, and instead only responds to the arguments defendant made in his answering brief. Even then, plaintiff's arguments are contradictory. First, plaintiff argues that "[t]he ALJ failed to consider [Ill's] consistent reports, despite being required to do so by the regulations." (D.I. 13 at 6) Plaintiff then reasons that "[w]hile Ms. Ill is not an acceptable medical source, her opinion was rightly acknowledged and considered by the ALJ as medical evidence." (*Id.*) If, as plaintiff contends, Ill "is not an acceptable medical source," the ALJ need not give her opinion any weight, and his failure to discuss exactly what weight he **did** give Ill's opinion is

grounds for neither reversal nor remand.

## 4. The devised RFC

As a part of step four, the ALJ determined plaintiff's RFC. The ALJ found that

plaintiff retained the capacity to perform

> sedentary work, except lifting 10 pounds occasionally and lesser amounts
> frequently, stand for 30 minutes, sit for 10 minutes consistently on an
> alternating basis during an 8-hour work day, five days a week, avoiding
> heights and hazard[ous] machinery, ropes, ladders, scaffolding, or stairs and
> limited to simple, routine, unskilled jobs that are low stress, require low
> concentration and memory, and can attend to tasks and complete schedules,
> mildly to moderately limited in her ability to perform activities of daily living
> and to interact socially and maintain her concentration, persistence and
> pace.

(D.I. 6 at 19) Plaintiff contends that the above RFC failed to include any limitations as

to fatigue, headaches, or the side effects of medications which are each well

documented on the record. (D.I. 9 at 27)

Plaintiff's argument ignores the hypothetical given to the vocational expert

wherein the ALJ asked the vocation expert to imagine a person having

> mild to moderate fatigue, energy loss, occasional headache, indicates
> migraine, and some moods swings of late, off which is somewhat received
> by her medications without significant side effects. But she says she derives
> some dizziness, nausea and some sleepiness from one or a combination.

(Id. at 64-65) (emphasis added) As the above hypothetical illustrates, the ALJ did

consider plaintiff's limitations regarding fatigue, headaches and side effects from

medication when formulating his hypothetical to the vocational expert. Therefore,

plaintiff's limitations were adequately considered in determining her RFC. *McDonald v.*

*Astrue*, 293 Fed Appx 941, 946 (3d Cir. 2008); *Bracciodieta-Nelson v. Comm'r of Soc.*

*Security*, Civ. No. 10-854, 2011 WL 1598661, at *13 (W.D. Pa. Apr. 27, 2011).

21

Furthermore, the ALJ was not required to give credence to plaintiff's full claims of pain and discomfort because, as explained in section 1, substantial medical evidence exists that contradicts plaintiff's testimony.

## V. CONCLUSION

In view of the foregoing, substantial evidence supports the ALJ's determination that plaintiff is not disabled and is capable of sedentary work. Plaintiff's motion for summary judgment (D.I. 8), therefore, is denied and defendant's motion for summary judgment (D.I. 11) is granted. An appropriate order shall issue.